Case number 20-1465 et al. LSP Transmission Holdings II LLC et al. Petitioners v. Federal Energy Regulatory Commission. Mr. Fallon for the petitioners, Ms. Chu for the respondents, Ms. Daly for the interveners. Council for petitioners, please proceed. Thank you, Your Honor. In the orders under review, the Federal Energy Regulatory Commission violated the FERC foreclosed competition for certain regionally beneficial projects between $100,000 and $229,000. Because if the commission would have applied this bedrock rate-making principle, cost causation, matching the benefits of the project to who's paying the cost, these projects could and likely would have been competed. Petitioners asked that the court remand the orders under review prefer to determine whether the just a reasonable rate for a market efficiency project in MISO should be between $100,000 and $229,000. Now petitioners in this case had a very easy ask. We simply asked, please don't foreclose us from competing from certain projects, for competing for certain projects, $100,000 to $229,000 projects that were economic, that would have to be really no harm from our ask. We weren't asking that these projects automatically be market efficiency projects. Those projects would still have to meet the 1 to 25 benefit to cost ratio. Moreover, in order to be competed, those projects would still have to show that more than one zone in MISO benefited from the project. One zone was allocated and one other zone. I think this is important. It's a very important case. It's a very important fact. There are no rate feasibility. When we asked FERC and MISO to calculate the benefits, that wasn't some Herculean ask that the petitioners were asking. There are no rate feasibility concerns that have been raised in this case. Certainly FERC didn't say any. The reason why they didn't is because they'll know the zones that benefit from the project by the analysis that they do to determine whether the project is economic. I would direct the court's attention generally... Are you saying no rate feasibility concerns? You mean there's no difficulty calculating for the benefits? Is that what you mean by rate feasibility? Yes, Your Honor. Yes, Your Honor. Yes. Thank you. I direct the court generally to JA 866 to 872, which has a very good discussion of the MISO planning process, specifically as it relates to congestion. In 870, the MISO over five planning cycles identified 15 projects that were quote-unquote economic. Now I would direct the court to JA 309. I'm sorry, there's a lot of words. I mean that they meet the 1 to 25 benefit to cost ratio. They have showed that the benefits of the project are 25% greater than the cost. If you look at JA 309, the MISO has a project. They have a project. They have benefit metrics. We've been talking about three of them in this case. They have benefit metrics. They apply the benefit metrics to the project. They look at the benefits by zone. They add up the benefits by zone, and if the benefits are more than 1 to 25, the benefits of the cost, then the quote the project is quote-unquote economic. So in doing that analysis, they know the zones that benefit, and the reason why we're sitting here in front of you all today is because the FERC ignored that for purposes of cost allocation and ultimately for competing these projects because FERC rejected our very simple ask. FERC said we're not going to let you compete. We're not going to let you compete. You didn't show that 345 KV and the existing 345 KV and below the KV threshold is unjust and unreasonable. We're not going to let you compete, so we're going to keep these projects in the other project bucket. We're going to keep them there, and because the projects are in the quote-unquote other project bucket, the costs are automatically allocated to the zone where the project is physically located, and so these projects, they're not going to be competed even though they know the beneficiaries or can easily determine the beneficiaries. Again, there's no rate feasibility concern here, the inability to calculate the benefits. Mr. Fallon, when they were they to do that over this category of projects in general, they might discern some non-pricing zone effects, but they're willing to say that in the aggregate on balance, not enough to impugn the category, and so they think that this is actually an appropriate treatment of the category of projects. Your Honor, I think what we're saying is that they know the beneficiaries. They know the beneficiaries. What they do is they put it in the category, and they never apply the beneficiaries, and Your Honor, if they did say that, well, there's just maybe a few or whatever, that's belied by the record in the case below concerning things like the Northern Indiana case and the like, and the fact that most congestion in the MISO is between 100 and 229 kV and the like, so if the FERC is saying that, that's sort of belied by the record. Is that responsive to your question, Your Honor? I'm not sure it is, but go ahead. So FERC also said, look, even for the projects we're going to let you compete, the 230 and kV above, we're going to let you compete on those projects. We're not going to let you compete if there's a quote-unquote immediate need, and if you look again at JA870, in JA870, there's been 15 of these projects, six of which were 230 kV and above, so there's been approximately one per cycle. The MISO said at JA320 that approximately one project each cycle will be part of this exemption, and so even for the projects that they did allow us to compete on, the immediate need exception they granted would foreclose likely that project. We believe there's likely an 85% chance, because most projects are needed within three years or less, an 85% chance that the project will be competing. This is what's so, where is your evidence that within MISO that 85% of these immediate needs, these projects which you can compete, will be treated as immediate need? Because that seems to be pretty critical to your attack. It was in our brief, Your Honor, that we analyzed, I think we got those figures, Your Honor, from the MISO and their analysis. I mean, I think that's their figures and it's cited in our brief. 85% of all the projects, these market efficiency projects, will be subject to the immediate need exception. 85%, Your Honor, I think the figure is 85% of all projects, and that was one of their debates, is that we had the wrong sort of, we were mixing apples and oranges. But I think our view is, 85% of the time the project would be needed, quote-unquote needed, within three years. And so if that project is bundled with a market efficiency project, then the project will more than likely... Sorry, when you say what's needed, you're talking like a baseline reliability project that's going to be needed within three years, and then it ends up having the other criteria qualified as a market efficiency project. No, this would be generally a project, and I don't think we were talking here about baseline reliability projects, we were talking generally about projects that are solving a reliability violation. That's what I'm trying to figure out, is just, and so whether it's other projects category or baseline reliability, they're all, is your point that, I guess, where is the evidence? It would make sense to me that reliability projects are something that we want to have addressed quickly, and so the extent market efficiency projects are covering those, then, but I just, I don't know that information, and I was, you know, I can't, for some credit, saying that you weren't quite, you know, and maybe you tell me why I'm wrong about this, that 85% of reliability projects in MISO have to be, are supposed to be done within three years. Well, what they look at is a very conservative planning model that the project is quote-unquote needed within three years, even though I think we've that the project won't be built more than likely within three years, and so they'll use other techniques to, the end service date for these projects would be more than three years, and so they're using a very conservative planning model, so it's not surprising that based on their very conservative planning model, 85% of the projects are quote-unquote needed within three years. Can I just back up and ask you about standing and whether you've identified any project under the MISO tariff that you would compete for if the KV threshold were lower, but are barred from because MISO stopped at 230 KV rather than going to the 100 KV that you prefer? Well, Your Honor, there have been, from the 2018 market transmission efficiency plan, the MISO plan, there were two projects that could have been competed, but they weren't because of the 100 to 229 KV threshold. And where did you identify that those were projects that your clients would bid on? Your Honor, my client bids on, would bid on a project if it has the opportunity. Where in the record does your client say we would bid on this project or all projects like it? No declarations? No, Your Honor, there wasn't a declaration. I cut you off. You started to say my client would bid on all. My client would bid on, my client would, if given the opportunity to compete, my client would bid on projects, would bid on projects with the opportunity to compete. And that's why I think our, but you're right, Your Honor. There was no declaration, but our client has won one of these competitive solicitations before, has competed and won, therefore, for those things. We would more than likely compete on these projects in the future. We don't have the right. They immediately have stopped us from competing for these projects. And that's why we go back and look at the Shirley case, which is what was cited by the FERC, or the, I'm sorry, the MISO in their brief. And they said, and the court said there, we see no reason anyone competing for a government benefit should not be able to assert competitor standing when the government takes a step that benefits his rival and therefore injures him economically. That's exactly what happened in this case, Your Honor. They took projects between 100 and 229 KV, and they're handing those projects to our competitors, are the incumbent transmission owners to build these projects. And so they're doing that. They're going to do that. They're handing our competitors and frustrating our ability to compete for these projects. Do you have been able to identify a specific project within 60 days of when the commission issued its decision? I'm sorry, Your Honor. I didn't hear the question. So you had to, you had to file within 60 days of the commission's decision, right? Yes. Would there have been enough time to identify specific projects as to which you would be harmed by the rule? Well, certainly being MISO. It's been a categorical rule. That's your argument. They were categorically walled off here. But would it, would you even have been able to identify something that quickly? Or is it the nature of categorical rules you can't? Well, I think, I mean, obviously the MISO is going through its planning process now. The projects that have already happened, it's really too late in that process. I mean, I think the idea that, you know, we would wait and somehow, and somehow file a complaint if we have benefits and this kind of discussion. I don't think that works because in the meantime, while the FERP process, the appellate process is going on, the projects are moving forward. I don't really know, your honor, within that 60 day window, if we could have identified a couple of projects in the, or a project in the most recent transmission planning program that was going through. I really don't know if that was the case. So I'm just trying to figure out how this, how this even works. So someone submits a project to MISO. We want to build this. We think it's an immediate need. Or we think it qualifies as market efficiency projects. And we want to build a project either that's going to be under 230 volts or it's an immediate need one. And you want to compete. What time window do you have to say, and then FERP at some point must say, you can treat it that way. It qualifies for that treatment. When is the time window when you could come in and say, hang on, hang on. We should be able to compete for that project. I just don't know how your process works. I think, your honor, this is all a MISO driven process. Once FERP sets the rules, I don't think FERP is getting involved. Maybe Ms. Valley can comment on that. But I don't think FERP is getting involved in the individual projects that are approved as part of the plan. And so what is, and so what would happen in this situation is the MISO board approves a transmission expansion plan. We say, hey, there's more than one zone that benefit. This project ought to be competed. We would then have to go to FERP and file a complaint, and file a complaint, and then FERP would have to act on that complaint. You can probably count on that. Once you do that, does that stop? No, absolutely not, your honor. The projects continue to roll on, if you would. And the projects continue to roll on. There's no stay. Right, so how long does it take for, since they're not competition, so the local utility is going to be the one that's going to build this. And so how long does it take between when they submit, there's sort of public notice, MISO submits this thing, this plan. Here's our plan for 2022 to FERP before the local construction folks that are your competitors, the local developers start sort of shovels in the ground. Do you have time for a FERP challenge and going to court? I really don't know, your honor. I would think that these projects, to the extent they're built, would happen within a year. But I really don't know, your honor. I really don't know that. I would think they would happen within a year, maybe a year and a half after the approval. Obviously, you may have to get some local permits. You may have to go see this environmental agency and the like. But I do think, your honor, I do think the situation here that is possibly being discussed is similar to what the court has dealt with in the pipeline cases, in the natural gas pipeline case, where the commission was giving people certificates, they were out building, and then people were working their way through the FERP and appellate process. And then by the time the court acted and said, hey, there's a problem here, the project was already in the ground. And the court just dealt with that issue in the Environmental Defense Fund case. Well, we've had other cases where the project has stopped. Have you, on behalf of your clients, filed a motion to stay in a particular project? No, your honor. But we don't believe that FERP would grant the stay. Maybe they might. Maybe they might. Who knows? Who knows? There may be public opposition. There may be opposition enough that FERP says we need to. So that's all speculation, all right? It's hard to say that these projects, which are not tiny and well known, and your client can identify, and you say FERP knows all this, but you're supposed to let the court know. It's your burden, all right, to show you have standing. And we need to know. Whatever FERP knows is interesting. But it's your burden, all right? FERP doesn't have to help you meet your burden in that regard. Secondly, I'm just not clear why, where your clients have all this information. You can't, and if you don't have the information, ask FERP to provide it. Why these cases can't be teed up with more specificity. I understand it's timely, it's costly, but there's a lot at stake. And reliability is something that the agency has decided is paramount in the projects that it has identified. Now, it may be wrong, but it seems to me in order to get to that, there's a hurdle that Article 3 sets for the court. And I'm just not understanding why experienced counsel at least when they come to this circuit, know that standing is a heavy threshold demonstration. And simply a good legal argument at that point is not enough. Your Honor, I think there are two separate issues here. We'll talk about the standing. But there were two separate issues. There was the immediate need, and then there was the 100 to 229 KV. That's, with all due respect, FERP's statement at least explains its explanation of why everything is an operational within three years. All right? And you haven't attacked that as a practical matter. Secondly, being barred from a category. But don't you have some obligation to assure the court that either because your clients are big or because of where they're located, this is precisely the project on which they would want to build or compete? I don't understand why your clients can't provide this information. That's all I'm getting at. No one's argued it's impossible to provide it. You say FERC has it, we'll ask them to give you that information. And if they turn you down, then you're in a different situation. Your Honor, I think FERC has, what we've said in terms of competitor standing is, we compete all over the country for projects. Right. And we don't really have to concern ourselves with what you do all over the country. Well, that's right, Your Honor. All right? So you know that, counsel. So you're coming to the D.C. Circuit, and you know that no matter what panel you're before, you're going to get questions on standing specificity eminence. And I don't understand why everybody's not prepared on this. I mean, we don't have any authority to overrule the Supreme Court. Your Honor, I think in the earlier discussion I did listen in on, in our case, though, what we're saying is, what FERC did is it provided a benefit to our competitors, and we are harmed economically. We did compete on one project. These projects are ongoing. They're ongoing projects. They're going to continue to identify economic projects between 100 and 229 KV. They're going to continue to foreclose us from bidding on those projects, if we were so inclined to bid on those projects. And I can't figure— If, if, if! I don't understand why we can't get some declarations in here, where people say, look, we bid before. This is profitable for us. We want to do it again. Now there's a project that FERC has in the pipeline, or that one of our competitors has in the pipeline, and that's precisely why we want to bid on it. And FERC is saying no, and you're saying, well, by putting all these into the immediate need category, that's a complete miscategorization, because these projects are not operational within three years. Your Honor, I think we're, I think we're saying two things on that. The immediate need exception was a separate issue that we briefed, but our, the other issue is, is that the projects between 100, that they did let us compete on, the immediate need for the 230 KV above, and for the projects 100 to 229 KV above, they foreclosed us from participating in these projects. Your Honor, and I'm not arguing with Your Honor, Well, you may, all you said here today is, your clients might someday want to bid on these projects. All right? You haven't said, and it seems to me your clients have the information, or if they don't, they ask FERC for it. I mean, the court is not trying to arbitrarily reject petitions on standing grounds, but we're simply looking for the hard information. And these projects are years in the development. Most of the lawyers who come before us are representing, quote, large actors. They know what's going on. This is not some stranger to the industry, much less stranger to the region. And I don't understand why, given you're as familiar with the Supreme Court decisions on standing as we, and presumably how tough it is in this circuit as compared to some other circuits, to show Article III standing. So why not come prepared with affidavits, declarations, et cetera? In other cases, once the Supreme Court started to ratchet up the standing requirements, the industry has come in with very specific information that they didn't used to. And it's unclear to me why. And it's also unclear to me why, and I know it may just be money. They don't want to spend the money to ask FERC to stay. There may be some competitive disadvantage on other projects, and so they don't want. But these are choices they make. And when the court has this heavy burden, we need help. Your Honor, it sounds like, Your Honor, is our view was this was a category exclusion. The 100 to 229 KV. I know, and all we know is the lawyer has told us that the people he represents or the entities he represents may one day want to bid. You're not making any commitment. You're not having any declaration. And goodness knows the Supreme Court has talked about these someday intentions are not enough. That's all I'm getting at. This is not the court coming up with some arbitrary rule, and it's not the Supreme Court. It's the Supreme Court interpreting the Constitution. I understand, Your Honor. I understand. Anything further? Shall we hear from the agency and then from the interveners and then give you some time on rebuttal? Yes. Yes, Your Honor. I have three minutes on rebuttal. Counsel for Respondent. Please leave the court. Susanna Chu for the commission. Thank you for hearing these cases today. I'd like to start with the timing and specificity questions that Your Honors have raised. There is nothing that prevented LS Power from submitting an affidavit about any project that was selected in the transmission planning processes of 2018, 2019 or any of these recent years showing that they had the ability to bid on a specific project but were precluded from doing so because of the way that BidContinent categorizes its projects. Well, I think the argument is, look, these are big operators that bid before. They have the ability to bid. All right. I don't think that's the question. Is it? Well, I think it's part of the question, Your Honor. I think the question is whether they were small operators. At least that's the representation that counsel's making on their behalf. So I don't know there's ability because that's not where the Supreme Court has focused. I mean, that's where we talk about ready, willing, and able. But that's not the issue at this stage. It's an imminence issue, as I see it. Yes, I think that's right, Your Honor. It's an imminence issue under Clapper, under New York Regional Interconnect, and all the other precedents. This case is very similar to the unpublished decision involving Ellis Power from 2017. As Your Honor is pointing out, Ellis Power may one day want to bid on a particular project in the BidContinent region. Wait a minute. They haven't pointed out any specific project. Sorry. Can I ask something? So imagine I own the women's-owned construction business situated within MISO. Or I have at least a branch within MISO. I have in the past bid on projects in MISO or wanted to bid. I have expressed my interest in continuing to bid. And certainly, I'm not saying they would. This is just hypothetical. First off the rule, it says, categorically, no women-owned construction companies can compete for X category of contracts. Right? FERC adopts that rule. This is not your FERC. This is bad FERC. So FERC X somewhere. I'll just go to Your Honor. Women-owned companies cannot compete for X category of contracts within MISO. Category. And your position is that to establish standing, I have to wait for a specific project to come along, which will be more than 60 days after that order has issued from FERC. And I then have to bid for this thing that I'm categorically forbidden to bid for. To have standing? What case can you tell me when there was a categorical bar to someone participating because of their identity? They still had to nonetheless. And there's no question they're qualified. They have the ability, like Judge Rogers says, that they have the interest, that they're active in the area. None of those are questions. But they nonetheless have to say, oh, there's one that I want in that situation. It's their business to bid. It's their business model to bid. They're active in this area. And they still have to wait for a project. They can't challenge the rule itself. And then what? Challenge that project? What's your best case for that? On a categorical bar like this? Well, Your Honor, I'm not aware of a case. No, and the prior LSP case was not that. No, no. Right, but I would expect that. Your position is that I would have to do that? I couldn't challenge the rule up front, unless there happened to be a project that was barred within 60 days of that order issuing. I couldn't challenge the order. I would have to wait for a project to come down the line two or three years later. And I would have to submit a completely pointless application and spend all the thousands or millions of dollars it takes to put that submission together to apply for something that FERC has said, as a matter of law, I'm not eligible to compete for. And then I would have, that's FERC's position. That's what it takes for me to have standing. Well, I think, Your Honor, that at a minimum, a declaration would have to be submitted. Well, I would have to submit a declaration that says, what would that declaration say? It would say stuff that FERC doesn't dispute right now, that I'm a business. If this is what I do, this is what we do for a living. I'm in the area. I've competed for things in the past in the area, right? This is what I do. And it's nothing infeasible or unreasonable to think that I'm going to keep on doing. In fact, I'm telling you, that's why I'm bringing this lawsuit. I'm going to keep challenging this. But you have said, okay, I'm going to do an affidavit that says FERC has said I'm categorically walled off. And if I weren't categorically walled off, I'd want to keep doing what I have been doing all the years before. And that I do everywhere else in the country. That's what the affidavit needs to say. I think the hypothetical you're posing, Your Honor, is would be a facial challenge to, of course- They have a facial challenge to your rule here. They have a facial challenge to your rule here. Right. And the difference being that as in the LS Power case, these projects have been ongoing. The exclusion from bidding for projects in the 100 to 230 kilovolt range predated this case. Let's not forget that in the orders on review, the commission actually lowered the voltage threshold. So the commission actually expanded the number of projects that are open to competition. But not as much as Mr. Fallon wants. Right. Right. So that's the harm he's depending on. That's the harm he's depending on. He said yes for going down to 1,000. That's our position of what's required. Did you have one- He's harmed by that. Did you have projects in the 100 to 229 range that were not baseline reliability projects and were not other projects? And so were open to competition in the relative period since this order issued? I am not aware of any that were. Okay. Then I'm not sure you had anything that I could have submitted a paper to be on. That seems to me sort of- If you're going to say they haven't shown standing, they didn't show us which project they want. You have to show, don't we have to have some plausible basis for concluding that there was something they couldn't submit a paper for? That they weren't categorized in this collective stream of exclusions that FERC has adopted? Right. Your Honor, I'm sorry if I gave a confusing answer. There were projects in the 100 to 230 kilovolt range. And LS Power does talk about specific projects. But at no point did they identify any specific project that they would have bid on. And I'm sorry, I might have misunderstood your answer. I mean, if there is, if there were, I take your point. If there were projects in the 100 to 229 range. Yes. That were not baseline reliability projects and were not other projects. So that they could have the other projects category. So that they could have bid on them and they didn't. Or they haven't pointed to those. But that's what I'm trying to ask. If it's a null set. Because you've got a series of exclusions here that FERC has adopted. So this is what's concerning me. If it's a null set of what they could have applied for. Then I don't know why they needed an affidavit to say. Or they certainly don't need to apply for. And they need an affidavit to say, there's nothing we could have applied for. But had there been, we would have. I mean, I think that's clearly, they clearly say that we want to compete. We want to compete for these projects. We have competed in the past. This is what we do for a living. I understand that, Your Honor. But I think that's, this is the Ellis Power case in 2017, right? That one of the two exclusions. No, this is not that case. Because that was not a categorical prohibition. There was. I think it was. No, it wasn't. Because there were these, there was some of the whole discussion in that case. That argument was that, in fact, what you had was. Well, we're concerned about the things where there's, there's this category of things you can bid on. But some of them, not 100% of them, some of them might be subject to a state right of first refusal. But whether the state will do it, whether you can still compete when a state does. Because these things change from state to state. They're not a model, as FERC explained at the time. And so whether, in fact, even the state, the rights of first refusal would, in fact, preclude competition was an open question. And then there was a redressability question the judge table raised, which was, all right, well, even if there is a right of first refusal, we can't redress it because the law, the law keeps that in place. So that was a very, you had particularized information that was needed there because of the nature of what was going on. But here, what we have, in their view, is, and I don't think FERC disagrees, is a categorical rule. There's nothing fact specific that's going to change. And no one disputes, no one disputes that LST is a huge contract suppression company that has the ability to compete in there, that it has competed in here, that it has a project that it's been interested in and applied for. But then, its theory is, we've been walled off. And to say that they needed to identify a project when FERC can't tell me that there was one they would have been eligible for, seems to me, at some point, we can't turn this into code pleading, right? That's not what standing is. If FERC can tell me there are ones out there that they could have identified that were something they could have competed for, that would be a totally different thing. I'm not sure that there were, Your Honor. It's possible that this valley might have an example. I don't know the answer to that. But I do think that there was a burden on petitioners to show the court that it does satisfy the Article III standing requirements. But I don't think that's on there. You don't, again, dispute that they operate, that they operate within MISO, that they've got the ability to operate within, no one, I think Judge Rogers said, this isn't about ability to do it or interest. Now, does anyone, do you dispute their sincere interest in competing? No, of course not, Your Honor. We do not dispute their interest in competing, no. Well, I don't know what that means, just let me say. Sincere interest in competing. I mean, I'd like to go to the mountains someday, but, you know, that's not enough. All right, so- We don't dispute that they're in the business right now of doing this very construction work that they're not allowed to do here. No, Your Honor, we do not dispute that they're a competitive transmission developer. I have a question on the merits, which is just looking at the basis on which FERC rejected MISO's first two proposals. It did so in part because MISO was going to calculate regional benefits for the sub-230 KV projects and then ignore them and allocate costs locally. Right? But now MISO is saying, well, we're just not going to calculate the non-local benefits, and FERC seems to have approved that. Can you respond to the petitioner's head-in-the-sand argument that it seems like what FERC has said is that MISO can allocate costs exclusively locally as long as it just doesn't know about whatever regional benefits the project might confer? Why is that not an apt characterization of FERC's position? Right. So, Your Honor, going back to the orders that you are referencing, the first and second regional orders, as the petitioner has called them, the commission never made a finding that projects in the 100 to 229 KV range necessarily produce regional benefits. So there is no finding that as a whole, in the aggregate, that those projects generally produce these broader regional benefits that necessarily mean that they should be in the market efficiency project category. So there just wasn't that finding. And that goes back to Old Dominion as well, where that case was a different case, where there was a whole category of projects that was acknowledged to have regional benefits. And yet all the costs were allocated to a single zone. And there, the petitioner objected to paying for those two projects. So that's not the situation here. The commission has never found that lower voltage projects produce these regional benefits. And there is ample evidence in the record that it's reasonable to have a cutoff. It's reasonable to distinguish between the higher voltage transmission projects that are more likely to produce more widespread regional benefits and the lower voltage projects that tend to have local benefits. That's in the- Where, on that point, where in the record did FERC explain its rationale for not having, not moving down to the 100 kilovolt threshold, but choosing the 230 kilovolt threshold instead? I mean, I take that to be the gravamen of Mr. Fallon's challenge on that point. And what is the explanation for stopping there? So a couple, Your Honor. First, in a section 205 context, the commission found that 230 kilovolts was a reasonable cutoff. And it's also important to remember the commission didn't even find that 345 kilovolts was unreasonable. Threshold. Generally, the commission has found it is reasonable for the mid-continent system operator to categorize its projects. That's how it manages its transmission process. And the commission has found that to be reasonable. Now, in the section 206 context, the commission found that LS Power had not met its burden of showing that 230 kilovolts is unjust and unreasonable, such that you have to bring the project threshold all the way down to 100 kilovolts. So help me out with that. So first decision in the Northern Indiana case dealing with inter-regional projects, the commission chose to take the threshold down to 100 kilovolts. And I guess that was in part because they wanted to make the MISO and the PJM threshold consistent. But is there any tension in your view between embracing the 100 kilovolt threshold in Northern Indiana and not doing that here? No, Your Honor. I don't think there is an inconsistency. Of course, the inter-regional cost allocation issue is before the court in case number 20-1262. And I think as Your Honor is right to point out, there was a specific mismatch between the two regions in that case. Between the Mid-Continent region and the PJM region, it was an entirely different record. There were specific projects that were being prevented from moving forward. These are specific projects that the commission had found would have inter-regional benefits, benefits to both of these regions. But the Mid-Continent voltage threshold and its project cost minimum of $5 million were preventing those projects from going forward. So in that particular context and on that particular record, the commission found that it was not just unreasonable to apply the threshold. But here, petitioners are saying that there are a couple of projects in the 2018 expansion plan as to which MISO determined that they benefited more than one zone. But nonetheless, they've treated them as purely local for competition purposes. And your response to that is? So the commission explained in the orders that these are isolated examples that do not, in your words, not in the aggregate and on balance, show that the entire category is regionally beneficial. I mean, these isolated examples do not prove that it's unreasonable to have a voltage threshold as whole. But you also had two applications before this by MISO in which it said, acknowledged it was going to have projects at a lower threshold and they were the ones that FERC rejected. And in the process, they were going to be able to identify what we call regional benefits, extra zone benefits, but that wasn't going to be factored into the cost application. Now, I understand how you characterize FERC's decision there, but isn't that also evidence that at a minimum, MISO thought it's going to find regional benefits in a sufficient immaterial number of cases to even go through the exercise? I'm not sure, Your Honor. I think that, well, I'm not sure what MISO was thinking. You know, I'm just asking on the paper that was before, you know, and said, and acknowledge your process is going to do this and it's going to identify this thing, but then you're not going to factor it into your cost allocation. Now, to be sure FERC didn't say we agree they're there or not, but MISO itself, this is what I'm talking about, evidence before FERC. I'm not saying FERC already made the decision. Evidence before FERC was that, geez, MISO has already got this process in place. And, you know, it's not in the business of running around Robin Hood's barn here doing things that are never going to materialize in anything, right? It's not in the business of spending time and resources identifying regional benefits that don't exist. And so don't, those two things, and then so it comes with the third application and it's sort of like, we're just not going to, you know, we just don't look, then FERC will sign off on it. But why are those, plus the Northeast Indiana case, plus the examples that they've given, collectively sufficient evidence that FERC didn't grapple with in this case? As I understand it, Your Honor, in the prior proposals, Mid-Continent was proposing to calculate the benefits and costs, both regionally and also locally. And Mid-Continent said, with respect to these projects that we're now talking about, that the local zone actually was receiving more benefits than it was paying in cost. So in the Commission's view, that was sufficient to justify cost allocation. But that doesn't mean that other zones aren't also receiving more benefits and not having a material amount of benefits and not having to pay a penny. That doesn't exclude that at all, does it? But it's possible that these other zones were receiving some modest spillover of benefits,  When did we do it? How do you know it's modest? How do you know it's modest? By the way, how does FERC define modest? I'm not sure if there is a specific numerical definition for modest. And it may vary depending on the region. Really? I'm not sure, Your Honor. Does that mean like 40%? That doesn't feel modest to me, but I'm not the expert. I think that the issue of the level of spillover benefits was more at issue in the baseline reliability question. No, I understand that. I'm just trying to understand what, you know, you're talking about what kind of evidence you need, and, you know, that, oh, that wouldn't have been enough because it might have been modest, but without knowing a definite, without FERC telling me what counts as modest, that would have been exactly something they could have done had they actually grappled with this evidence in front of them. I'm not sure that there is a specific threshold, honestly, Your Honor. Right, that would have been a good time to address that. Right, but I think the Commission found that the Ellis Power just didn't meet its burden here, because it was two isolated examples, and the- But the two isolated, if a judge killer just flagged, just be clear, it's not just that, right? They've got two examples, and you want to use the adjective isolated. They've got two examples. You've got the Northern Indiana case, where the entire structure of it was a recognition that you can have regional benefits at this lower range of voltage, and that was enough to even motivate a between systems project like that, and that FERC didn't want to stop those types of things, because there are these kinds of benefits. So you have that, and then you have twice MISO coming to you, and for some reason, going through a hunch for things that we can maybe just assume that MISO wouldn't have gone through the process of identifying regional benefits as it does if it was a null set. Right, Your Honor. So I think- So it's not just two. Okay, so we've got more than that. Well, there were only two specific actual projects in the record. There's a Northern Indiana case. Oh, yes, of course, of course. The Northern Indiana case, yes. But that was, again, yes, Your Honor, that was different, and the commission found it to be different. I think what we have to remember here- Can you run by me again? Why is that different in the sense of, why are the potential for inter-regional benefits in that case necessarily different from the potential from regional or inter-zone benefits in this case? Well, two things, Your Honor. I think the commission found in the record there that there were these very specific projects that were being held up, and they're different kinds of projects. These are inter-regional projects that could be located in PJM entirely with benefits to MISO, or it could be located in MISO with benefits to PJM. Commission was clear it was looking at that particular record. But I think what we're dealing with here is that the commission was finding that just the possibility of some projects in this range providing some regional benefits was not enough to show that it's not just unreasonable to have a voltage threshold. And it may be helpful to look at the commission's market project order at JA-1039, paragraph 18. The commission is quoting some language from another case, but it is saying that- Can you tell me the page again? I apologize. Sorry. Of course, Your Honor. It's JA-1039. Okay. It's paragraph 18. And the commission is talking about- It's quoting from other cases, but it's explaining that by limiting transmission projects to certain voltage thresholds, that what we're doing here is establishing clear and objective standards and avoiding the need for the system operator to, quote, extend resources on the consideration of transmission projects that are less likely to provide regional transmission benefits. By extending resources, you're talking about running a competitive process? Right. Right. That is part of it, Your Honor. Yes. And the commission here is balancing the reality of the system operators need to extend resources, the administration of these transmission planning processes, which are large and complex and lengthy. So it's balancing those considerations against the need for competition and for reliability and the broader public policy considerations. I don't know if you were listening when Mr. Glover was on, but I wonder if you have any sort of bigger picture perspective that you can give us on why it is that, you know, since Order 1000 kind of made this sea change and said, look, we think competition is really salutary. We're going to try to open up a lot more to competition. We're generally getting rid of, right, the first refusal. And it just looks, you know, however many years out, like, you know, is that an overly optimistic expectation or like, how can we understand this as a healthy functioning under Order 1000 as distinct from kind of, you know, incumbent actors with monopoly power, just dragging their heels and FERC looking the other way? I mean, I don't mean to be, you know, just trying to be tendentious in putting the question to see whether you can cast any light on that for us. Of course, Your Honor. I appreciate the issues you are bringing up. And actually all of these issues are under consideration in a holistic way. Right now, before the commission, the commission actually issued a notice of proposed rulemaking on transmission infrastructure development. It's actually FERC docket RM21-17. And many parties, including the system operator and the transmission developer here, have submitted comments to the commission about all of the issues, like all of these, about voltage thresholds, about immediate need reliability exceptions, about the myriad issues that go into these transmission planning processes. So I don't know how the commission ultimately will address these concerns, but they are front and center because we know the importance of transmission development, obviously, and the significance of competition. So these are issues that are very actively being examined. What is this docket? And where did it come from? And what's the scope of this? It's it is docket RM21-17. And you said that all these issues are under consideration. What is it like? Is it sort of notice of proposed rulemaking or it's just a yes. It was an advance notice of proposed rulemaking, and the commission is looking very broadly at transmission issues, especially as we know the importance now of connecting renewable sources of power to the grid, making sure that power gets to the population centers where it's needed. I mean, these are really difficult and important public policy issues and they're front row center at the commission. So what's the status of that? Because that was 2017. We're five years after that now. Is it still just an advance notice of proposed rulemaking? Sorry, it's actually, I believe it was initiated in 2021. It's RM21. I thought you said 2017. Okay, I misunderstood. Oh, I'm sorry. I believe it was 2021. I misunderstood you, sorry. I believe that was the date and I might need to double check and I'll correct it. I will send a letter correcting myself if that's incorrect. And that might be good that they're doing that there, but why, I mean, these particular situations here, they already have order 1000 on the books. Why just put them here up in the place to grapple with the implications of order 1000 for these two categorical rules that you hear? Right, well here in this particular proceeding, again, with respect to the voltage threshold, the commission is finding that it's not unreasonable to have a voltage threshold in this, you know, that it is giving some deference to the regional stakeholder process that produced this. It was a five year long process that involved a huge amount of give and take that ultimately produced the 230 kilovolt threshold. So there is that. And with respect to the immediate need, exception, as your honors know, that that exception is not specific and unique to the bit continent region. That exception exists in three other systems that we know of in PJM and the Southwest Power Pool and the ISO New England. Of course, the commission actually investigated the system operator's implementation of this particular exception and largely found that they were being implemented as a design. I have some questions about this. So the commission's rationale is it has these five criteria that are supposed to limit and make it rare, I think the word, or the exception that you'll have an immediate need and not the rule. Right, it's five criteria that are supposed to help make it a limited exception. Limited exception. Can you tell me, other than the requirement that they be online in three years, or the criteria actually just says needed in three years or less. Other than that one, can you tell me how many of these criteria do anything to limit these projects? I mean, posting an explanation, that doesn't stop anybody. Transparent process, that doesn't stop anybody. Received comments, that doesn't stop anybody. And maintaining a list of task projects, that doesn't stop anybody. Have any of these criteria ever been used in any meaningful way to slow down how many things qualify as an immediate need exception project? They seem empty to me. I'm not sure that they have. Well, I think that the criteria are designed to make sure that there is notice to all market participants and that there's the ability to comment on them. And there is also a dispute resolution process to- That was one of the whole issues here was that you said, well, you don't have to do it before. That's the whole issue here. You don't have to do it beforehand. And that instead, you can, I guess, raise it back when they're deciding that something is a baseline reliability project. But not all immediate need projects are baseline reliability projects, are they? That's right, Your Honor. So a couple of things there. How do you think this process works if someone could actually challenge it before it's too late? Well, actually, Your Honor, I know that there is that statement in the order about the timing of the notice. But actually, it is explained, especially in the Mid-Continent brief, I believe, at page 15. I know, where did the commission- I looked over to the commission to explain this. Okay. Well, in the order itself, just after the sentence regarding the timing- Are we on the same order you're talking about before then? Yes, Your Honor. And I apologize. Let me just get the page. Okay. I mean, on paragraph 23, I have the five criteria. Do not require MISO to post a description of need before designating the incumbent transmission owner. Yes, Your Honor. I think that sentence may have been inarticulable because it's the sentences immediately after that on JA-1041 that show that MISO actually posts the reliability needs during the baseline reliability study process. And this study process does take place before the incumbent transmission developer is designated. If someone- That's just MISO. If someone wanted to challenge it, there's nothing you can challenge at that point, right? That's just MISO. I believe that any market participant could submit comments within- Submitting comments is not a limitation. Submitting comments is not a limitation. But they could challenge it. I mean, they could challenge it within MISO. During the baseline reliability study process, before- To FERC? We can bring it to FERC? They certainly could file a section 206 complaint to FERC, yes. Before when MISO- When? I don't know how this process works. And I certainly don't know how it works if the immediate need project is not- Are all immediate need projects baseline reliability projects? No, not necessarily, Your Honor. Okay, so then this process doesn't work then. No, I think it does work, Your Honor. The commission found that the process actually did work in these- in three other regional transmission systems. No, it said we have those criteria in three other ones. I saw no finding that, in fact, they actually were working to limit anything. I apologize, Your Honor. What I'm referring to is the other case that was recently argued to the court. Saying that- I'm just still trying to understand how this is actually- because I read those criteria and particularly in light of the commission's decision in this case. It doesn't have to be before. I don't see how submitting comments to MISO- You submit comments to MISO and then MISO says- When do they say, no, we're going to treat it as immediate need and designate the incumbent transmission on it. When do they do that? I believe that is after the baseline reliability study process and Miss Valley may be able to shed some additional light on it. But when the commission embraced this, the commission said, this is our check. This is our limit. So I'm hoping that the commission can tell me without asking MISO to do the work for it. I can't review MISO's decisions. I can only review yours. Of course, Your Honor. What I'm saying, though, is that there is the opportunity to challenge the reliability need finding within the baseline reliability project process. And there is always the opportunity to bring a section 206 complaint to the commission. You can bring a section to- At what point? Most likely when the- The whole thing's done and over and we've already designated the incumbent transmission on it. Well, I think as Judge Rogers was pointing out earlier, there's nothing stopping somebody from speaking of stay from the commission or from the court for that matter. Commission, this is your big check. This is commission's sole real check on these reliability and immediate need projects is that somebody has to bring a 206 challenge to a MISO determination to give something to the incumbent transmission owner. And that's not good enough by itself. They're going to have to get a stay and demonstrate a likelihood of success even though all these criteria will be met. You're not going to give them a stay when they've met all the five criteria. Right, I couldn't comment as to what might happen in a given situation, but I would like to take one step back. The immediate need reliability exception is recognizing that there are some truly urgent reliability needs. If there is a violation of North American Electric Reliability Council standard, then that issue has to be addressed very quickly to avoid brownouts to avoid. I understand that it sounds like so the commission told the Seventh Circuit and it's OSP case, the one that was at issue in the baseline reliability ones. Commission told the Seventh Circuit that most if not all baseline reliability projects are online in three years. And in fact, one of the factors the commission has balanced in its decision making is MISO's desire that all baseline reliability projects be online quickly. Now, these criteria aren't going to be much of any real check at all. And at least within MISO,  I don't know what they've told courts that they do everything in three years. But at least as to everything that the commission has talked about here, which is baseline reliability projects who qualify for meeting need, that's the only thing that's mentioned here. Commission's already told the Seventh Circuit that's all. It's not a limit. It's all of them. Most if not all is the quote from the Seventh Circuit transcript right around minute 30. Right. So, Your Honor, we're not talking about it's just the baseline reliability. That's all the commission talks about. But they have to be, what we're talking about is the universe of projects that are baseline reliability projects that also meet the criteria for a market efficiency project. Well, we just talked about this criteria. Those five criteria are not a limit at all. No, no, no. But that also meet the market efficiency criteria that these projects are 230 kilovolts or more and that they cost $5 million or more. And the commission here is recognizing the reality, which is demonstrated in the record, that the competitive developer process is a lengthy one. Does it have to be? Could the commission not allow or can MISA not propose an expedited bidding process? The government does this all the time. I think that mid-continent has tried to expedite its processes. But no matter what, there is time that is required to do. Okay, but that's the only reason. And to review all of these. But that's the reason for the exception. I mean, that's the broader, that's the reason for its existence. No, but what I'm trying to get at here, I understand that's what the commission said, but it said this is going to be limited. And yet there's nothing limited. We know at least for those baseline reliability projects that qualify as market efficiency projects or might. And those are the only things that the commission talked about here in telling us where someone could bring a challenge in the baseline reliability project assessment stage. MISA, the commission has already told the Seventh Circuit that MISA's view is we want most, if not all, online within three years. That's not limited. I think because it has to meet the other market efficiency criteria. Also in the record. I guess I'm just asking whether all reliability projects, virtually all, are really going to end up falling within this exception. I understand the rationale for why nobody wants reliability to take 10 years. The commission can't have it both ways. It can't say it's going to be a limited exception. If in fact, most, if not all, to use your words, reliability projects are going to fall within this time period. I don't think that's correct, Your Honor, that most, if not all, reliability projects will fall within that time period. Actually, right. I'm just quoting from what the commission told the Seventh Circuit. So in this record... They told them other things, too. Right, Your Honor. I don't have before me the record in that proceeding. But here, Ms. Condon submitted a testimony at JA320 that it was estimated that this exception would impact approximately one baseline reliability project per MTES cycle. And that's every one year transmission planning cycle within the Mid-Continent region. It's at the bottom of page... Does that prove true? JA320. Your Honor? Does that prove true? I'm not sure, Your Honor, but that was the prediction that the commission was making on the record in this case. One out of how many? One out of how many? There are... That would qualify as market efficiency projects for which there could otherwise be bidding. So one out of all of the projects in each of the transmission planning process cycles, which potentially could be hundreds and misvalued. No, no, no, no, no. We have to talk about how many that would qualify as a market efficiency project for competitive bidding. It doesn't say any good to say, well, it was just the baseline reliability project because those have been carved off from competition. That's not a limited category for those that would qualify as other projects. That's certainly not a limited category. That's the majority of projects that MISO proposes now. It's for many years now, it's been other projects. So that's what I'm asking. I'm not sure that that information is in the record, Your Honor. At least I... Just saying one doesn't really tell us a lot. Right. So I don't think that Ellis Power made the showing in the Section 206 complaint that as far as I'm aware, you know, there wasn't an adequate showing that this exception would follow the rule. But in any event, the commission is also, you know, it has made clear that the Order 1000 planning process is about process. It's not intended to dictate substantive outcomes. And that is one of the principles that the commission was operating under when it considered how these exceptions are being implemented in multiple regional system operators. If you have a system operator who's committed to doing these things in three years or less, that seems a different situation. I just have one last question. I know we're way over time here. In their, back on standing, in their reply brief on page five, LSP says the record includes evidence of two regionally beneficial 161 kilovolt economic projects included in the 2018 NISO transmission expansion plan that petitioners were prohibited from competing for because they were designated other projects and didn't meet the religious threshold. If they had cut and pasted that into a declaration, would that give them standing? I'm not sure, Your Honor. You know, I think, why not? What part of your theory of standing doesn't that make? You know, I think it would, right, I think the declaration still would have to include some other information about- Like what? About the, you know, the specific project that they, that they had the ability to bid on it and, you know, that they otherwise satisfied article three to- Well, I don't understand- What else aren't you arguing? I mean, you're not arguing causation of redressability. So, what you've been, all I've heard you argue about is injury in fact. And why isn't that an injury in fact? Right. In that scenario, yes. I mean, yes, the injury in, it is arguing- Imminent! Right, right, Your Honor. How can they? You keep wanting them to do imminent and then they have to wait for another project to come along. They want to challenge your rule. Actually, there are a lot of assumptions underlying Judge Millett's questions. And counsel, I don't think you're in a position to make confessions for the commission. That is right, Your Honor. I'm not in a position to make the confession. Okay, I thought she was in a position to argue article three standing. That was my last question. Your Honor, I just don't think that it has been demonstrated in the circumstances of this case. And I think that the petitioners could have made more of an effort to demonstrate its standing with greater specificity. In sum, I think the commission was balancing multiple considerations here. I mean, it has to balance the interest, its competition, not just for the sake of competition, but for, you know, it's also balancing the needs, the reliability needs on the grid. It's balancing other public policy objectives. And it's also operating under the presumption that there is no one-size-fits-all approach for each region and that regional stakeholder processes do mean something. So it made the decision here that it was not unreasonable to have a voltage cutoff for this market efficiency project category. And I think that the orders reasonably, reasonably explained the commission's findings. Thank you. Thank you, Your Honor. Counsel for intervenors. May it please the court. I am Carrie Valley for Mint Continent, appearing on behalf of intervenors for respondent FERC. I think there are a lot of questions that have come up today regarding the MISO process and planning and how it works and the whole framework that's been presented in these cases. And so I have highlighted a few of those areas I'd like to touch on that were brought forward in this discussion and might just work back from where we most recently were. Certainly, the petitioners here have raised issues with the two projects in MTEP 18 that had benefits beyond the local zone. It's important to recall that MISO itself presented that analysis and that analysis demonstrated that the local zone in both of those cases had benefits in excess of cost. That meant the standard for meeting that the cost and benefits are roughly commensurate with net in both of those cases. And the circumstances that the petitioner have raised do not change that. When going to the issue of the specificity for making a standing case, the petitioner itself has raised these two questions and whether or not they could have indicated that they had an ability to would have been on those projects if that is the court's question. Those projects and what they were were certainly presented in our stakeholder process. And I believe that the petitioners could have made that case if they had intended on those cases. One where we getting back to the most recent discussion on the immediate need reliability exception, it is very limited. And the petitioner in its case outlined the total number of baseline reliability projects. That is not indicative of the projects that are going to be baseline reliability projects that also meet the MEP criteria. We expect that to be a very small universe. But nonetheless, in the stakeholder process, moving to present, what should, if any, cost allocation changes should we have? What do they look like? What are the improvements? And what are the concerns that might arise from that? It arose in the stakeholder process that by lowering the voltage for market efficiency projects, you might incorporate more baseline reliability projects that met that MEP criteria. And I think I need to step back one moment under the project hierarchy. A project will be allocated based on its essentially highest value. So if you are a baseline reliability project and also meet a market efficiency project criteria, you're going to be allocated as a market efficiency project. If you're going to get competed. Exactly. Unless it's immediate need. Unless it is immediate need. And where we found here was that that universe of projects might bring up a baseline reliability project that was needed within three years. And the commission has an established framework for saying, yes, we want to make sure that that reliability is not impaired by the competitive developer selection process that adds potentially a year to that moving forward on that project. And so for this discrete number of projects. Well, can you tell me? Sorry. Can you tell me if it's really discrete? Because that's where I'm getting mixed signals. I told you what the commission said. MISO has said and to the Seventh Circuit, most, if not all, baseline, I get that we were talking now that baseline reliability projects that elevate to market efficiency standards. So that's the framework we're talking about right now. But most, if not all, baseline reliability projects within MISO are completed within three years because MISO understandably wants to do reliability projects fast. I mean, that's why it's called a reliability project. Is that accurate or not accurate? It's not. I wouldn't say it's not what MISO wants. It's what comes out of the reliability study. So our planning process identifies a transmission issue, then evaluates proposed solutions. And it is not only MISO's solution or the owner's solution. It is those things and any stakeholder can present an alternative in that process. So this is there is an ongoing process to evaluate those reliability needs and what that reliability need is and how it's going to be met. And so that is how that is identified. Some of those are near-term needs. And we want to make sure that those near-term needs... When you say some, I'm really trying to understand how many are done, are online within reliability projects. Yeah. You know, on baseline, other projects, whichever one, market efficiency, how many are online, at least at the time at the time you're picking who's going to develop it at the time of the developer selection are to be online within or needed within three years. I'm not sure I'm exactly following your honor's question in terms of we will... How many of those baseline reliability projects are presented with that, you know, three-year time frame that it has to be in service? I don't know that exactly. I'm not asking exactly. Really, I'm trying to understand here whether this is, in fact, a limited category or not. Well, what is... Do you understand that? Yes. Yes. What is the limitation is that baseline reliability, the project that also meets a market efficiency project criteria. That is the big limiter in this case, that only for those baseline reliability projects because other... I know, but it's all... If just to qualify as a baseline reliability project in practice, those are all coming online within three years for most, if not all, are coming online within three years, then saying, well, it also counts as market efficiency isn't going to change that fact. So... I understand what you're saying. Yep. I understand. Yes, your honor. And I don't know. I don't have that exact answer for you. What I would offer is that the, you know, baseline reliability projects generally are just baseline reliability projects. It is only we want to make sure for that instance where it is also a market efficiency project that we meet that reliability need. And I know that your honor had asked the question of how many of these have there been. We had in our testimony that we expected maybe one per year. This tariff framework only became effective in 2020. We've only recently concluded the one planning cycle that came after this. And so we don't have any in that cycle that meets that criteria. So we did not have one. We've only had one cycle since the tariff framework was fully effective. It came on. It became effective at the end of a process that had started significantly in advance of its effective date. But you've had baseline reliability projects for a long time. As to that category, do you know if, in fact, it was accurate to say most, if not all, are online within three years? I do not have that. All right. Anything further? Yes. I would like to touch on a few other things. Yes. On number one, the LEP project or actually I'll touch on NIPSO first. The significance of the interregional market efficiency project between Mid-Continent and PJM. That is a unique circumstance. The court had been present or the commission had been presented in that case with evidence to suggest that these lower voltage projects could have congestion benefits to both regions. And based on that limited record in that case, directed MISO to lower the voltage threshold for only projects between Mid-Continent and PJM. Parties had argued for a broader application and the commission rejected it as there wasn't evidence to support a broader application. Those projects are, as mission council had noted, can be located in either region. They are intended to facilitate improved congestion between the two RTOs and are uniquely separate from or different from the regional MEPs. And when the commission had made that initial order, it did note that what was going to the cost allocation going to be? Was it going to be the same or different? And MISO came, moved forward and we had a lengthy commission proceeding and exactly what that cost allocation would be. I also wanted to note that on the causal connection, the petitioners in this case have raised a number of issues with economic other projects, but have identified no causal connection that on a global basis, these economic other projects have region wide benefits. There were two projects identified and those projects also exhibited benefits in excess of cost to the local zone. And that is what is important to show that that existing cost allocation method continues to be effective. And then I did want to touch on a little bit about the local economic. I have two points. One, I did want to touch on the local economic project category that was previously registered by the commission. It's important to note that in that case, MISO and its stakeholders had attempted to create a new project category and presented it to the commission that was ultimately rejected. But in that case, that did not remove the other project category from the MISO tariff. That other project category cost allocation method was still eligible for projects that wouldn't have met that new project category. So that it's important that while we attempted to create a new framework, it ultimately was not successful. It did not change the fact that the existing cost allocation method for other projects is just unreasonable going forward. All right. Thank you, counsel. Thank you. All right. Counsel for petitioner. Thank you, your honor. I know the court's been at it a long time this morning. I don't want to be respectful of your all's time. Right. Briefly. Yes. But I would like to talk about a little bit the relationship between northern Indiana and northern Indiana. There were these projects the commission found there were significant regional benefits between the two regions. Between the two regions and the commission relied on a quote unquote quick hit study. And that study showed that the projects 138 to 161 KB had significant regional benefits in both regions. The only how does that help you counsel? Because the only difference in this case, your honor, is that our projects are this project is only in the MISO. It's solely within the MISO. And in the northern Indiana case, they were talking about interregional market efficiency projects under the PJM MISO joint operating agreement. So we're just talking about your projects. Our projects are solely within MISO. What projects? Your clients don't have any. Are you talking about market efficiency projects? Yes, market efficiency projects, your honor. All right. So you're saying within what? There are only two. No, your honor. What we were saying is they did this quick analysis. That was in the Indiana case. That was in the Indiana case. In our case, they looked at 10 projects in the MISO stakeholder process. Right. All 10 of those projects were between 100 and 229 KB. And all 10 of those projects had regional benefits, benefits to the project where the project was located. And also to other regions within the MISO. Did they outlay local benefits in the commission's expert opinion? Your honor, the solicitor, the commission never said in this case that it's OK because the local zone benefits more than, they benefit more than their cost. They never said that. And I think there's a good reason why they didn't say that. Because they can calculate the benefits. And so it was, first of all, it's a post hoc rationalization on the part of FERC. Well, did you present evidence to the commission? We showed that the 10 projects that were in the stakeholder process, the two projects, we also showed the connection in the Northern Indiana case. We also showed the connection between congestion and the project that solved the congestion. All right. Anything new, counsel? No, your honor. We'll find it in the record. Yes, your honor. Thank you, counsel. Thank you, your honor. Thank you all, counsel. We'll take the project. We'll take the cases under consideration. Thank you.
judges: Rogers, Millett, Pillard